## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
## SOUTHERN DIVISION

**PATRICK H. GREEN,**

      **Plaintiff,**

   **v.**

**FRANCIS J. HARVEY, Secretary of the Army, Department of the Army, United States of America,**

      **Defendant.**

**Civil Action No.  AW-03-1839**

## MEMORANDUM OPINION

Plaintiff Patrick H. Green ("Plaintiff" or "Green") instituted this employment discrimination action against Defendant Francis J. Harvey, Secretary of the Army ("Defendant"),[1] alleging claims of unlawful retaliation (count I), disability discrimination (count II), and hostile work environment (count III) pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq; ("Title VII"), and the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701, et seq.  Previously, this Court issued a Memorandum Opinion & Order dismissing counts II and III for failure to state a claim pursuant to Rule 12(b)(6), and allowing count I to precede to discovery.  Currently before the Court is Defendant's unopposed Motion for Sanctions [18] and Motion for Summary Judgment [19].  The Court has reviewed the pleadings and applicable law and has determined that a hearing is unnecessary.  See Local Rule 105(6) (D. Md. 2004).  For the following reasons, Defendant's Motion for Summary Judgment is granted and

---

[1] Plaintiff initially filed this action against Les BrownLee, in his official capacity as Acting Secretary of the Army, Department of the Army.  Francis J. Harvey became the Secretary of the Army on November 19, 2004.  Therefore, pursuant to Fed. R. Civ. P. 25(d)(1), Francis J. Harvey is automatically substituted as the proper defendant in this action.

Defendant's Motion for Sanctions is denied-as-moot.

## FACTUAL & PROCEDURAL BACKGROUND

The following facts are taken in the light most favorable to Plaintiff. In May of 1986, Green began working as a Motor Vehicle Operator ("MVO") at the Walter Reed Army Medical Center ("Walter Reed"), Transportation Motor Pool, located in the Forest Glen Annex in Silver Spring, Maryland. Upon acceptance of the MVO position Green informed Walter Reed that, as an individual rated by the Veterans Administration as a 40% disabled veteran, he had medical conditions that would limit him to only working special hours. In compliance with Green's request for special hours, Walter Reed permitted Green to work the early morning shift that began at 0630, and to not work nights, weekends, or rotating shifts.

Since 1989, Green has worked in the Walter Reed Motor Pool as a WG-08 MVO. The Walter Reed Motor Pool performs approximately 26 daily missions of providing passenger shuttle service between various military facilities as well as providing logistical support, such as transporting medical specimens and x-rays. As a WG-08 MVO, Green's major duties include operating trucks, tractors with trailers or semi-trailers. In his capacity as a WG-08 MVO, Green's job duties included operating gasoline or diesel powered trucks or truck tractors with trailer or semi-trailer, performing preventative maintenance on the vehicles, and loading and unloading the cargo. Green has worked as a MVO, without incident, and has received favorable annual performance reviews each year.

In August of 1998, Green suffered a shoulder injury while on the job, and subsequently had recurring problems with his shoulder. In April 2000, Green came to Dr. Un Hun Saplan ("Dr. Saplan"), a staff physician at Walter Reed's Occupational Health Clinic ("OHC"), complaining of back pain and a torn rotator cuff in his left shoulder. In response to Green's injuries, Dr. Saplan placed Green on limited

duty. In September 2001, Dr. Saplan placed Green on a work restriction of lifting no more than 50 pounds. Green also visited Dr. Joseph P. Cincinnati, a personal orthopedic physician, who recommended that Green be restricted from the following: lifting anything more than 50 pounds, any pulling or significant pushing, and any activity that could aggravate his shoulder problems.

On March 12, 2002, Martin Brown ("Brown") was appointed as Operations Supervisor of the Transportation Division at Walter Reed. On March 26, 2002, a dispatcher at the motor pool failed to assign a driver to a scheduled mission that required a tractor-trailer. The mission was at the end of the day, and the only tractor-trailer driver at the Motor Pool was Green. After receiving his assignment, Green informed Brown that, based on his doctor's orders, he could not drive tractor-trailers because he was a disabled veteran and he had a torn rotator cuff. Brown advised Green that there would be no special favors for the MVOs, and that if Green could not work on a stake bed tractor-trailer then Green would not be permitted to drive motor pool vehicles at all. Brown told Green that he did not have to drive the mission. Brown also informed Green that he would check into Green's medical status. Brown later checked Green's medical file and discovered that Green had various medical conditions. Nevertheless, Green's file did not contain a medical profile that prohibited him from operating tractor-trailers. Brown has not assigned Green to drive a tractor trailer since March of 2002.

On April 10, 2002, Green applied for worker's compensation benefits and submitted a temporary medical disability profile from Dr. Cincinnati restricting Green's lifting of heavy objects and recommending that Green not drive a tractor trailer. Dr. Cincinnati's recommended that Green only be permitted to drive buses and vans. Due to the restrictions indicated by Dr. Cincinnati, Brown assigned Green to missions not requiring the operation of a tractor-trailer. On that same day, Green filed an informal complaint of

discrimination with the EEO office at Walter Reed. On April 12, 2002, two days after filing his informal complaint of discrimination with the EEO office, Green was advised that he was no longer to drive any vehicles in the Motor Pool. On April 19, 2002, Brown presented Green with a new performance standard for his job stating that Green was required to work on tractor trailers with stake beds.

On May 10, 2002, Green had a conversation with Morris Foxx ("Foxx"), a Wage Leader, regarding which carrier run Green wanted to be assigned. Fox assigned Green to drive the northbound carrier run, rather than the alternate southbound carrier run which sometimes required lifting in excess of 100 pounds. On May 13, 2002, Green reported to work and learned that Brown assigned him to the Southbound carrier run. Green completed his assignment on the southbound carrier run.

On May 14, 2002, while lifting a dolly on the southbound carrier run, Green aggravated his shoulder injury and sought medical treatment. Green's physician placed him on medical leave until May 28, 2002. Green's physician also placed him on lifting restrictions from May 15, 2002 through May 22, 2002, and instructed to follow up with his regular physician. Green was then seen by Walter Reed's OHC on May 15, 2002, and was given stricter work restrictions of no lifting over 5 pounds and no driving power vehicles until he could be reevaluated on May 22, 2002.

Green received a physician's order for sick leave from May 16, 2002 through May 21, 2002. On May 21, 2002, Green returned to Dr. Cincinnati for follow-up, and was placed on work restrictions of no lifting over 5 pounds, limited reach, push and pull work with left shoulder, and all work should be below shoulder level. On May 28, 2002, a physician at the Johns Hopkins Community Hospital gave Green an OHC form stating that, for the following four weeks, he was to perform work below shoulder level and not lift anything more than five pounds. On that same day, Green filed a claim for federal worker's

4

compensation benefits. On the worker's compensation form, Dr. Cincinnati indicated that medical records showed Green was disabled for work for the time period starting from May 15, 2002 through May 28, 2002. Green was seen by Walter Reed OHC on May 28, 2002, for his left rotator cuff sprain and he subsequently received a return to work slip with restrictions.

Upon Green's return to work on May 29, 2002, Brown made comments verbally berating Green for taking sick leave and requested further medical documentation. On the same day, Brown relieved Green from all driving duties and reassigned him to a position as the vehicle dispatch. Brown gave Green a Change of Shift Memorandum ("Memorandum") outlining the changes. The Memorandum informed Green that starting June 12, 2002, his new work shift in the dispatch position would change from 0630 - 1500 to the new hours of 0900 - 1700. As a result of this schedule change, Green had to discontinue his regularly scheduled physical therapy routine which he had followed for the past sixteen years, and the schedule change negatively affected his sleeping disorder.

Green requested a return to his original work schedule that he had prior to Brown's becoming his supervisor, but his requests were refused by Brown. Green provided Brown with notes from his physician advising that the dispatch job caused Green to have tension headaches, and advising that Green should be returned to driving motor vehicles. On September 3, 2002, Green was returned to full duty as a MVO WH-8. However, despite physicians' notes to the contrary, Green continues to have to work a schedule he does not prefer.

On June 19, 2002, Green pursued formal complaint alleging claims of discrimination, harassment, and retaliation with the Walter Reed Equal Employment office ("EEO"). On October 8, 2002, the Walter Reed EEO Office dismissed Green's claims for failure to state a claim. On March 19, 2003, the EEO

office reversed and remanded the case back to the agency.

Green was given notice that had the right to file a civil action within 90 days of receipt of the Decision, and Green elected to exercise his right to bring a civil action. Accordingly, on June 20, 2003, Green filed a complaint against Defendant in this Court alleging claims of unlawful retaliation based on protected conduct (count I), unlawful discrimination based on disability (count II), and hostile environment (count III).

On September 26, 2003, Defendant filed a Motion to Dismiss or, in the alternative, a Motion for Summary Judgment. On July 7, 2003, this Court entered a Memorandum Opinion & Order granting-in-part, and denying-in-part Defendant's Motion. In particular, this Court dismissed Green's disability and hostile work environment claims for failure to state a claim upon which relief may be granted. On the retaliation claim, however, the Court found that Green's allegations that his transfer to a new job assignment sufficiently state a claim upon which relief may be granted. This Court also noted, at that point in time, that the Court was "not prepared to dismiss this Count prior to the opening of discovery." Pursuant to the Court's Scheduling Order, the close of discovery was scheduled for December 3, 2004.[2]

On February 28, 2005, Defendant moved for summary judgment. Defendant never submitted an opposition in response to Defendant's Motion for Summary Judgment. Defendant's Motion for Summary Judgment is ripe, and an opinion is now issued.

---

[2] On December 3, 2004, Defendant submitted a status report informing the Court that the parties had not completed discovery. Defendant noted that Plaintiff failed to participate in discovery. In particular, Plaintiff failed to: propound written discovery requests or take depositions, respond to Defendant's written discovery requests, appear for a scheduled deposition, and reschedule the missed deposition.

STANDARD OF REVIEW

This case is currently before the Court on Defendant's Motion for Summary Judgment. Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, thus entitling the moving party to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). If the moving party has met that burden, the non-moving party must then persuade the court that a genuine issue remains for trial. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). However, there must be more than just a factual dispute; the fact in question must be material and the dispute must be genuine. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the court must view the facts in the light most favorable to the nonmovant, see Anderson, 477 U.S. at 255, "bare allegations unsupported by legally competent evidence do not give rise to a genuine dispute of material fact." Solis v. Prince George's County, 153 F.Supp.2d 793, 807 (D. Md. 2001). Summary judgment should be granted unless a reasonable jury could return a verdict in favor of the nonmovant on the evidence presented. McLean v. Patten Cmtys. Inc., 332 F.3d 714, 719 (4th Cir. 2003) (citations omitted).

DISCUSSION

I.   Motion for Summary Judgment

Green complains that he was subjected to intentional discrimination on the basis of disability in retaliation for filing an complaint for discrimination with the EEO office against his supervisor, Brown. A plaintiff lacking direct evidence of retaliation, as here, may utilize the McDonnell Douglas Corp. v. Green, 411 U.S. 729 (1973), framework to prove a claim of retaliation. See Hill v. Lockheed Martin Logistics

7

Mgmt., Inc., 354 F.3d 277, 284, 85 (4th Cir. 2004) (en banc). In the McDonell Douglas framework, the plaintiff must first establish a prima facie case of retaliation. Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2005). If the employer sets forth a legitimate, non-retaliatory explanation for the action, the plaintiff then must show that the employer's proffered reasons are pretextual or his claim will fail. Id. More specifically, the plaintiff can prove pretext by showing that the "explanation is 'unworthy of credence' or by offering other forms of circumstantial evidence sufficiently probative of [retaliation]." Mereish v. Walker, 359 F.3d 330, 336 (4th Cir. 2004) (citations omitted). The Court now turns to the first part of McDonnell Douglas, the prima facie case.

    A.    Prima Facie Case of Retaliation

To establish a prima face case of retaliation, Green must show that (1) he engaged in a protected activity, such as filing an EEO complaint; (2) that Defendant took an adverse employment action against Green; and (3) that a causal relationship existed between the protected activity and the adverse employment activity. Price, 380 F.3d at 212. Here, Green clearly engaged in a protected activity by filing a complaint of discrimination against his supervisor, thereby satisfying the first prong of a prima face case of retaliation. The contested issue here is whether Green has satisfied the second prong of a prima face retaliation claim, *i.e.*, establishing that Defendant took an adverse employment action against him. Adverse employment actions include any retaliatory act that results in an adverse effect on the terms, conditions, or benefits of employment. Von Guten v. Maryland, 243 F.3d 858, 865-68 (4th Cir. 2001) (citations omitted).

Green bases his retaliation claim on the following laundry list of acts which occurred after he filed his EEO complaint: (1) his supervisor's refusal to allow Green to operate motor vehicles; (2) his supervisor

8

giving him a performance standard that required him to work on tractor trailers with stake beds; (3) his team leader's assigning Green to the south carrier run; (4) his supervisor comments that berated Green for taking sick leave and requesting medical documentation of Green's medical condition; (5) Green's reassignment to the position of a dispatcher; (6) his supervisor changing Green's work schedule from 0630 -1500 to 0900 - 1700; and (7) his supervisor refusing Green's request for reasonable accommodations. The Court will address each in turn.

Green initially asserts that Brown's decision to deny him his primary duty of operating motor vehicles at Walter Reed constitutes an adverse employment action. Here, Green has failed to proffer evidence that elimination of the benefit of driving a motor vehicle adversely affected him. To the contrary, Green represented to Brown that he was unable to drive tractor trailers because he had a torn rotator cuff. The record shows that Brown prevented Green from diving tractor trailers based on Green's own assertions that he was a disabled veteran. Therefore, the elimination of the benefit of driving motor vehicles was actually for Green's own physical *benefit*. Accordingly, this Court cannot find that the denial of a motor vehicle in these circumstances constitutes an *adverse* employment action.

The change in Green's performance standard was not an adverse employment action. A disfavored change in a performance standard is only actionable where the new performance standard detrimentally alters the terms or conditions of the recipient's employment status. See Von Guten, 243 F.3d at 867 (finding that only "a retaliatory downgrade of a performance evaluation could effect a term, condition, or benefit of employment"); Spears v. Missouri Dep't of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000) ("unfavorable evaluation" constitutes an adverse employment action when used "as a basis to detrimentally alter the terms or conditions of the recipient's employment").

9

In the present case, Green avers that following the filing of his EEO complaint, his supervisor presented him with a new performance standard for his job that required Green to work on tractor trailers with stake beds. In his complaint, Green asserts that his doctor expressly restricted him from driving tractor trailers with stake beds, and the new performance standard therefore directly interferes with his health and well being. Green, however, has presented no evidence that the new performance standard detrimentally altered the terms, conditions, or benefits of Green's employment. Green never shows either that the change in his performance standard resulting in him having different job responsibilities or that his job related benefits were reduced. Indeed, as a WG-08 MVO, Green was required to operate any trucks, and/or tractors with trailers or semi-trailers. However unpalatable the prospect of working on tractor trailers with stake beds may have been, that requirement, by itself, did not rise to the level of an adverse employment action.

Green cannot establish that his supervisor's allegedly berating comments about him taking sick leave constitute an adverse action. Although Brown made allegedly berating comments, the record does not show that Green was ever denied sick leave, see Scott-Brown v. Cohen, 220 F.Supp.2d 504, 511 (D. Md. 2002) (stating that the denial of sick leave affected a benefit of employment), nor suffered any form of discipline for taking sick leave. See Newman v. Giant Food Inc., 187 F.Supp.2d 524, 529 (D. Md. 2002) (finding that a mere conversation in which a manager questioned an employee for taking sick leave every month on the same day cannot constitute an adverse employment action). Nor can his supervisor's request for medical documentation be considered an adverse employment action. This action, however irritating, does not rise to the level of an adverse employment action because it does not adversely affect the terms, conditions, or benefits of Green's employment. See Boone v. Goldin, 178 F.3d 253, 256 (4th

10

Cir. 1999) ("Congress did not intend Title VII to provide redress for trivial discomforts endemic to employment").

Nor can the Court find that Green's change in work duty hours constituted an adverse employment action.[3] To find that an employee has been denied a benefit of employment the Fourth Circuit has required a significant modification in work schedule. Hill v. Michelin N. Am., Inc., 252 F.3d 307, 312 (4th Cir. 2001) (finding that requiring an employee to work a less regular schedule with longer work days denied the employee a benefit of employment). Here, Green's change in work duty hours did not require him to work a less regular schedule with longer work days. Indeed, Green's work schedule changed by less than three hours and the total hours that he worked actually decreased from 8 ½ hours per day to 8 hours per day. Additionally, the record shows that the Motor Pool's mission did not require a dispatcher prior to 0900 hours. Thus, upon Green's reassignment to work as the vehicle dispatch, the Defendant had to change Green's hours to fit the needs of the dispatch mission. Moreover, Defendant was not bound by contract, agreement, or otherwise to give Green the shift of his choice. Accordingly, this Court cannot find Green's change in work duty hours sufficient to constitute a denial of a benefit of employment.

Green's challenges to his reassignment to perform the south carrier run and his reassignment to work as a dispatcher do not constitute an adverse employment action. A reassignment can only form the basis of a valid Title VII claim if the plaintiff can show that the reassignment had some significant detrimental effect. James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 376 (4th Cir. 2004). A change in job

---

[3] It appears from Plaintiff's complaint that his allegation that Defendant denied him reasonable accommodations appears to be based on the same allegation as his denial of work duty hours. In essence, both claims involve Green's scheduling concerns and therefore, for purposes of this opinion, the Court will treat both claims as alleging a retaliation based on a denial of work duty hours.

11

assignments can be significant, if, for example, "plaintiff was exposed to more dangerous conditions or stifled advancement." Von Gunten, 243 F.3d at 868. In his complaint, Green alleges that his reassignment to the southbound run was a transfer to a capacity that required lifting heavy loads in violation of his medical disability profile. Green, however, has failed to proffer any evidence that the southbound run actually requires lifting heavier loads than the his original assignment at the northbound run. In the absence of such evidence, this Court cannot find that Green's reassignment to the southbound run was "dangerous." Even assuming the southbound run actually requires heavier lifting, the record shows that, upon his reassignment to the southbound run, Green repeatedly advised Green not to violate his lifting profile. Indeed, Brown instructed Green to break down the cargo boxes and ask for help from the other soldiers if any of the cargo was heavy. Thus, it appears that Green's working conditions largely resulted from Green's own failure to follow the instructions he was given.

Green also alleges that his transfer to dispatch caused him to have headaches and chronic pain. Green, however, has not provided the Court with any evidence that this reassignment actually was detrimental to his health. Previously, when this Court denied Defendant's Motion to Dismiss Green's retaliation claim, the Court specifically stated Green, in all likelihood, must show medical records that would support such a claim. Now that discovery has ended, Green has failed to present the Court with any medical records to show his reassignment to dispatch was detrimental to his health. Accordingly, this Court cannot find that Green's reassignment to the dispatch position was "dangerous."

In sum, Green has failed to show that any of his laundry list of grievances, based on retaliation, demonstrate an adverse employment action. Accordingly, Green's retaliation claim fails as a matter of law.

B.  Legitimate Non-Retaliatory Reasons/Pretext

Even assuming Green has demonstrated a prima facie case, Defendant has met its burden of presenting legitimate, non-retaliatory reason for its actions: (1) Since March 2002, Brown has not allowed Green to operate a tractor-trailer due to Green's own medical restrictions; (2) Any changes to the job classification were made by the classification section of the civilian personnel office and not by Brown's supervisor; (3) Because of Green's medical restrictions, Brown assigned Green to various other missions that did not involve operating a tractor trailer; (4) Brown assigning Green to the southbound run was done for Brown to see if Green could complete the run within his medical restrictions; (5) Brown assigned Green to dispatch until Green's medical profile and restrictions could be assessed; (6) Green's schedule and shift changed as a result of Brown assigning Green to the only available slot for a WG-08, and thereby avoiding the overtime problem.

In short, Green has failed to present any evidence to show that any of these legitimate, non-retaliatory reasons were pretextual. Indeed, Green has not even responded to Defendant's Motion for Summary Judgment. Therefore, in the absence of evidence to the contrary, this Court must enter summary judgment in favor of the Defendant.

II.  Defendant's Motion for Sanctions

Defendant has also moved for sanctions as a result of Plaintiff and his counsel's failure to comply with the Court's January 19, 2005, Order granting Defendant's Motion to Compel discovery requests. Defendant filed its Motion to Compel based on Plaintiff's failure to provide responses to Defendant's written discovery requests and Plaintiff's failure to appear for a scheduled deposition. In particular, Defendant seeks to have Plaintiff's complaint dismissed for his non-compliance with the Court's Order

compelling discovery.

For the reasons mentioned above, however, this Court has already found sufficient reasons to enter summary judgment in favor of the Defendant. Because the relief that Defendant seeks is dismissal of Plaintiff's action, as the appropriate sanctions remedy, Plaintiff's Motion for Sanctions is denied as moot.

## CONCLUSION

For the aforementioned reasons, the Court GRANTS Defendant's Motion for Summary Judgment and Defendant's Motion for Sanctions is DENIED-AS-MOOT. An Order consistent with these rulings shall follow.

| | |
|---|---|
| May 31, 2005 | /s/ |
| Date | Alexander Williams, Jr.<br>United States District Judge |